**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| DAVID PADUA; MICHAEL GLENN; | : | |
| BRIAN WEBER; ASSOCIATION OF NEW | : | |
| JERSEY RIFLE & PISTOL CLUBS, INC.; | : | |
| SECOND AMENDMENT FOUNDATION; | : | |
| SAFARI CLUB INTERNATIONAL; | : | |
| NEW JERSEY FIREARM OWNERS SYNDICATE; | : | No. 25-13527 |
| AMERICAN SUPPRESSOR ASSOCIATION; and | : | |
| NATIONAL RIFLE ASSOCIATION OF | : | |
| AMERICA; | : | |
| | : | |
| _Plaintiffs_, | : | **COMPLAINT FOR DECLARATORY** |
| | : | **AND INJUNCTIVE RELIEF** |
| v. | : | |
| | : | |
| MATTHEW PLATKIN, in his official capacity as | : | |
| Attorney General of New Jersey; and PATRICK | : | |
| CALLAHAN, in his official capacity as | : | |
| Superintendent of the New Jersey Police; | : | |
| | : | |
| _Defendants_. | : | |
| | : | |

## LOCAL CIVIL RULE 10.1 STATEMENT

The mailing addresses of the parties to this action are:

**Plaintiffs**

David Padua
1981 McKee Avenue
Deptford, NJ 08096

Michael Glenn
347 Independence Drive
Forked River, NJ 08731

Brian Weber
23 Lake Drive
Lambertville, NJ 08530

Association of New Jersey Rifle & Pistol Clubs, Inc.
5 Sicomac Road, Suite 292
North Haledon, NJ 07508

Second Amendment Foundation
12500 N.E. 10th Place
Bellevue, WA 98005

Safari Club International
501 2nd Street NE
Washington, DC 20002

New Jersey Firearm Owners Syndicate
21 West Lincoln Ave
2nd Floor, #1
Atlantic Highlands, NJ 07716

American Suppressor Association
6085 Lake Forrest Drive
Suite 200A
Atlanta, GA 30328

National Rifle Association of America
11250 Waples Mill Road
Fairfax, VA 22030

**<u>Defendants</u>**

Matthew Platkin
Office of the Attorney General
25 Market Street
PO Box 081
Trenton, NJ 08625

Patrick Callahan
Office of the Superintendent
New Jersey State Police
PO Box 7068
West Trenton, NJ 08628

Plaintiffs David Padua, Michael Glenn, Brian Weber, Association of New Jersey Rifle & Pistol Clubs, Inc., Second Amendment Foundation, Safari Club International, New Jersey Firearm Owners Syndicate, American Suppressor Association, and National Rifle Association of America, bring this Complaint against Defendants, Matthew Platkin, in his official capacity as Attorney General of the State of New Jersey, and Patrick Callahan, in his official capacity as Superintendent of the New Jersey State Police, who are officials responsible for enforcing a state statute infringing the right of peaceable citizens to keep and bear firearm suppressors for lawful purposes.

Plaintiffs further allege as follows:

## **INTRODUCTION**

1. The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. Under this constitutional provision, the peaceable citizens of this Nation have a fundamental, constitutionally guaranteed right to keep and bear common arms for defense of self and family and for all other lawful pursuits.

2. Despite this constitutional guarantee, the State has enacted, and Defendants enforce, a prohibition on the possession of firearm suppressors in New Jersey.

3. A suppressor is a safe, effective, and commonly used device that decreases the noise level of a gunshot. Suppressors improve a firearm's functionality and are integral to the safest and most effective use of a firearm. They decrease the risk of permanent hearing damage, help protect the hearing of hunters and those nearby, reduce noise pollution from firearm discharge, increase the accuracy of firearm use by reducing recoil and shot flinch, make firearms training safer and more effective, and improve the effectiveness and safety of firearms in the use of self-defense and defense of the home. Contrary to representations in movies and television, meanwhile, suppressors do not make a gunshot silent, and they are rarely used by criminals.

4.      Federal government authorities and medical organizations have endorsed suppressors and deemed them one of the most effective tools to help prevent hearing loss from firearm use.

5.      Indeed, the Federal Government has now conceded that suppressors are entitled to Second Amendment protection. *See* U.S. Br. at 4, *Peterson*, No. 24-30043 (5th Cir. May 23, 2025), Doc. 129-2 ("U.S. Br."). "As a result," the Federal Government has insisted, "a ban on the possession of suppressors"—like the State's ban here—"would be unconstitutional." *Id.* That view is correct and commanded by any fair application of the Supreme Court's Second Amendment jurisprudence.

6.      Because of their various safety-enhancing and effectiveness benefits, suppressors are widely used by peaceable citizens in the United States, including for target shooting and hunting. They are legal to possess in 42 States, may be lawfully registered and possessed under federal law, and are possessed by Americans in the millions.

7.      The State's enactment, and Defendants' active enforcement, of the criminal prohibition on suppressors denies peaceable individuals who reside in New Jersey, including the members of the organizational plaintiffs, such as the individual plaintiffs, their fundamental, individual right to keep and bear common arms.

8.      In *New York State Rifle and Pistol Ass'n v. Bruen*, the Supreme Court stated the test for Second Amendment violations: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. 1, 24 (2022).

9.     The plain text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 28 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). The Supreme Court has defined "arms" under the Second Amendment broadly with a "general definition" that includes all "modern instruments that facilitate armed self-defense." *Id*.

10.     New Jersey's ban on suppressors implicates the Second Amendment's plain text. By banning suppressors, New Jersey effectively bans suppressed firearms, and suppressed firearms are "arms." Alternatively, suppressors facilitate armed self-defense by enhancing the effectiveness of firearms for self-defense and mitigating the hearing risks associated with using firearms. Given their integral use with firearms, it is unsurprising that federal statutes treat them as such. *See* 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C).

11.     Therefore, by prohibiting Plaintiffs from possessing and carrying suppressors, Defendants have prevented Plaintiffs from "keep[ing] and bear[ing] Arms" within the meaning of the Amendment's text. U.S. CONST. amend. II. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

12.     Defendants cannot meet their burden. *Heller* and *Bruen* have provided the *sole* historical tradition that can remove an arm from the Second Amendment's protective scope—the tradition of banning dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 47. To be banned, a firearm must be both "dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) (emphasis in original). Suppressors are neither dangerous *nor* unusual. Arms that are in common use, like those equipped with the suppressors New Jersey has banned, cannot be unusual. And suppressors, which *increase* the safety of a firearm

and facilitate the safest use of a firearm, cannot be dangerous.

13.    Suppressors do not meet the Supreme Court's threshold for banning arms, and the New Jersey ban challenged herein must be held unconstitutional.

## JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

15.    Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988.

16.    Venue lies in this Court under 28 U.S.C. §§ 1391(b)(1) and (b)(2).

## PARTIES

### Plaintiffs

17.    Plaintiff David Padua is a natural person, a resident of Gloucester County, New Jersey, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms.

18.    Plaintiff Michael Glenn is a natural person, a resident of Ocean County, New Jersey, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms.

19.    Plaintiff Brian Weber is a natural person, a resident of Hunterdon County, New Jersey, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms.

20.    Plaintiff Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC") is a not for profit membership corporation, incorporated in the State of New Jersey in 1936, which represents its members. ANJRPC represents the interests of target shooters, hunters, competitors,

outdoors people, and other law-abiding firearms owners. Among the ANJRPC's purposes is aiding such persons in every way within its power and supporting and defending the people's right to keep and bear arms, including the right of its members and the public to purchase and possess suppressors. ANJRPC brings this action on behalf of its members, including Individual Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

21.    Plaintiff Second Amendment Foundation ("SAF") is a nonprofit educational foundation incorporated in 1974. SAF's mission is to preserve the individual constitutional right to keep and bear arms through public education, judicial, historical, and economic research, publishing, and legal action programs focused on the civil right guaranteed by the Second Amendment to the United States Constitution. SAF brings this action on behalf of its members, including Individual Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

22.    Plaintiff Safari Club International ("SCI") is a leading association in defending the freedom to hunt and promoting sustainable use wildlife conservation worldwide for over 50 years. SCI has over 100,000 members and advocates and 152 Chapters around the world. SCI has almost 400 national members in New Jersey and chartered its first "Garden State" Chapter in 2024. SCI brings this action on behalf of its members, including Individual Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

23.    Plaintiff New Jersey Firearm Owners Syndicate ("NJFOS") is a New Jersey non-profit corporation with over 3,000 members supporting the Second Amendment rights of New Jersey residents for over a decade. NJFOS brings this action on behalf of its members, including

Individual Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

24.     Plaintiff American Suppressor Association ("ASA") was formed in 2011 with the purpose of securing pro-suppressor reform nationwide. ASA has lobbied in 35 U.S. states and territories, fought to ease the archaic restrictions on suppressors in D.C., testified in front of dozens of legislative bodies, hosted countless suppressor demonstrations for legislators, policymakers, media, and the public, and funded research proving the efficacy of suppressors. ASA brings this action on behalf of its members, including Individual Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

25.     Plaintiff National Rifle Association of America ("NRA") is a nonprofit corporation founded in 1871. NRA is America's oldest civil rights organization and America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. NRA has millions of members across the nation, including in New Jersey. NRA brings this action on behalf of its members, including Individual Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

26.     Mr. Padua is a member of ANJRPC, SAF, SCI, NJFOS, ASA, and NRA.

27.     Mr. Glenn is a member of ANJRPC, SAF, SCI, NJFOS, ASA, and NRA.

28.     Mr. Weber is a member of ANJRPC, SAF, SCI, NJFOS, ASA, and NRA.

**Defendants**

29.     Defendant Matthew Platkin is sued in his official capacity as the Attorney General of New Jersey. As Attorney General, Defendant Platkin is the chief law enforcement officer of the

State and exercises supervisory authority over all county prosecutors in the State. *See* N.J.S.A. § 52:17B-103. This authority includes the authority to enforce the State's general prohibition on the possession of suppressors.

30.     Defendant Colonel Patrick Callahan is sued in his official capacity as Superintendent of the New Jersey State Police. Callahan is responsible for managing and controlling enforcement of the State's criminal laws by the New Jersey Police, including the State's general prohibition on the possession of suppressors.

## FACTUAL ALLEGATIONS

## I.    NEW JERSEY'S UNCONSTITUTIONAL SUPPRESSOR BAN.

31.     New Jersey bans suppressors, listing "silencers" under a list of "Prohibited Weapons and Devices" defined as "Firearms, Other Dangerous Weapons and Instruments of Crime." N.J.S.A. § 2C:39-3(c) ("the Suppressor Ban").

32.     New Jersey defines a "silencer" as "any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol or other firearm to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearm." N.J.S.A. § 2C:39-1(g).

33.     While suppressors are sometimes referred to as "silencers," suppressors do not silence firearms. "Despite common myths and misconceptions, suppressors do not silent host firearms," instead they "decreas[e] the overall sound signature." *The American Suppressor Association (ASA)*, YOUTUBE (Nov. 26, 2014), http://bit.ly/3KlM4yj (demonstrating the use of suppressors and their decibel level reduction). The sound from a suppressed firearm "may be muffled or diminished," but "it can still be heard." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33, 36

(2016) ("Halbrook"); *see also United States v. Bolatete*, 977 F.3d 1022, 1028 (11th Cir. 2020) (referring to "suppressors or silencers" as "the same thing"). Indeed, suppressed firearms are still quite loud.

34.    The Suppressor Ban imposes criminal penalties, declaring that "[a]ny person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree." N.J.S.A. § 2C:39-3(c).

35.    New Jersey law provides a narrow exception for certain uses of suppressors in hunting. Specifically, the Suppressor Ban does not apply to "any person who is specifically identified in a special deer management permit issued by the Division of Fish and Wildlife to utilize a firearm silencer as part of an alternative deer control method implemented in accordance with a special deer management permit . . . while the person is in the actual performance of the permitted alternative deer control method and while going to and from the place where the permitted alternative deer control method is being utilized." N.J.S.A. § 2C:39-3(g)(5). The exception does "not, however, otherwise apply to any person to authorize the purchase or possession of a firearm silencer." *Id.*

36.    Federal law defines suppressors as firearms subject to the Second Amendment. Suppressors are regulated under the National Firearms Act ("NFA"), which defines suppressors as a "firearm." 26 U.S.C. § 5845(a)(7). The Gun Control Act also defines a silencer as a "firearm." 18 U.S.C. § 921(a)(3)(C).

37.    The Supreme Court likewise defines "arms" under the Second Amendment broadly with a "general definition" that includes "modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28.

**A.    New Jersey Has Criminalized Suppressors Despite Their Common Use.**

38.    Suppressors have been broadly permitted and commonly used for over one hundred years.

39.    In 1908, Hiram Percy Maxim applied to patent a device that could be attached to a firearm to reduce gunshot noise. He dubbed his invention a "silencer." Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908) (issued May 24, 2010), https://perma.cc/5JMV-WWS4. Several years later, Maxim explained that he invented the device to reduce sound disturbance caused by firearms. Halbrook at 41.

40.    President Theodore Roosevelt possessed a suppressor, the Maxim Silencer. Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, GUNS.COM (May 18, 2012), https://perma.cc/7K47-4LZE.

41.    The common use of suppressors has continued into the modern day. Millions of suppressors are owned by peaceable Americans.

42.    As of 2021, Americans had registered 2.6 million of suppressors with the federal regulator of firearms, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). *See Firearms Commerce in the United States: Annual Statistical Update 2021* at 16, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (2021), https://perma.cc/9FXV-62FU.

43.    Lawful suppressor ownership has continued to rise. By the end of 2024, ATF reported a total of 4.5 million registered suppressors. *See Suppressor Owner Study* at 7, NSSF (2025), https://perma.cc/BRS8-4ZK6.

44.    Suppressors are widely permitted throughout the United States. Contrary to the New Jersey Suppressor Ban, 42 States permit their citizens to possess and use suppressors.

45.    Federal law likewise permits the possession of suppressors, subject to regulation. To lawfully own a suppressor under federal law, individuals must register the suppressor, obtain

permission, submit fingerprints, and pay a $200 tax. *See generally* 26 U.S.C. §§ 5811–12, 5845. Congress recently reduced the tax on the making and transfer of suppressors to $0 effective January 1, 2026, but it did not repeal the registration provisions. *See* One Big Beautiful Bill Act (the "BBB") § 70436, Pub. L. No. 119-21 (2025).

46.    Suppressors are also widely permitted around the world. *See* Halbrook at 76–78 (cataloging the many countries that permit suppressors). Indeed, several European countries allow for the possession, use, and transfer of suppressors far more liberally than New Jersey does. *See generally id.* To provide just a few examples, in Germany, suppressors "are allowed for hunting and may be *required* for professional hunters and certain others for hearing protection and noise pollution." *Id.* at 77 (emphasis added). In Norway, "[s]uppressors may be freely transferred and possessed if the person has a gun license," and a "wide selection may be ordered online." *Id.* In the United Kingdom, suppressors are "widely advertised" and may be acquired for "good reason," including "work, sport, or leisure." *Id.* at 78.

**B.    New Jersey Has Criminalized Suppressors Despite Their Many Lawful, Safe, And Common Uses.**

47.    Suppressors have many common, legal uses. Firearm suppressors are commonly possessed and very infrequently used for criminal activity. Although not required under the Second Amendment, suppressors *increase* the safety of firearm use.

48.    First, suppressors are commonly used for hearing protection. Suppressors are one of the best and most effective forms of hearing protection for firearms use. The American Academy of Otolaryngology-Head and Neck Surgery ("AAO-HNS"), "one of the world's largest organizations representing specialists who treat the ears," *About Us*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY, https://perma.cc/T364-YTFL, recently issued a position statement "endors[ing] the use of firearm suppressors as an effective method of reducing

the risk of hearing loss, especially when used in conjunction with conventional hearing protective measures." *Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY (Nov. 18, 2024), https://perma.cc/A9EA-Z95P. This position statement explained that the "benefit" of using a suppressor "is *additive* when used with ear-level hearing protection devices such as circumaural muffs or ear plugs." *Id.* (emphasis added). The endorsement of suppressors by one of the largest groups of specialists in hearing damage further supports the Plaintiffs' argument that suppressors promote the safe use of firearms and are in fact critical in preventing hearing damage.

49.     The National Hearing Conservation Association ("NHCA") Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise recommends the use of suppressors to reduce the risk of hearing loss. Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise* at 1, NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017), https://perma.cc/Q5SK-CLL.

50.     The CDC has recommended the use of suppressors for hearing protection. Indeed, according to the CDC "[t]he *only* potentially effective noise control method to reduce . . . noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." Lilia Chen & Scott E. Brueck, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CENTERS FOR DISEASE CONTROL AND PREVENTION, NOISE AND LEAD EXPOSURES AT AN OUTDOOR FIRING RANGE – CALIFORNIA 5 (2011), https://perma.cc/34CH-T5PY (emphasis added). The CDC accordingly has recommended that, "if feasible and legally permissible," firearm training facilities should "attach noise suppressors to firearms to reduce peak sound pressure levels." Scott E. Brueck et al., NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CENTERS FOR DISEASE CONTROL AND PREVENTION, MEASUREMENT OF EXPOSURE TO IMPULSIVE NOISE AT

INDOOR & OUTDOOR FIRING RANGES DURING TACTICAL TRAINING EXERCISES 14 (2014), https://stacks.cdc.gov/view/cdc/172442.

51.    This widespread support makes sense. Without the use of suppressors, "[t]he level of impulse noise generated by almost all firearms exceeds the 140 dB peak [sound pressure level] limit recommended by [OHSA] and [NIOSH]." Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, AUDIOLOGY TODAY, Mar.–Apr. 2011, at 38, 40. Consequently, "it is not surprising that recreational firearm noise exposure is one of the leading causes of [noise induced hearing loss] in America today." *Id.* With a suppressor, however, the sound of a firearm can fall within safer levels. For example, the sound of a Smith & Wesson 9mm pistol with a suppressor can be as low as 127–130 decibels, as opposed to 157–160 decibels without a suppressor. David Kopel, *The Hearing Protection Act and 'Silencers'*, WASH. POST (June 19, 2017), https://perma.cc/45ZW-JW6S. An AR-15 rifle with a suppressor, meanwhile, makes a noise around 132 decibels. Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST (Mar. 20, 2017), https://perma.cc/ADY2-JXC5.

52.    Indeed, suppressors can be more effective for hearing protection than traditional forms of hearing protection like ear plugs or earmuffs. One meta-analysis found that "th[e] review of 20 published studies demonstrated far worse performance than the corrected NRR[(Noise Reduction Ratio) of earmuffs and earplugs] suggests: the laboratory NRRs [Noise Reduction Ratios] consistently overestimated the real-world NRRs by 140% to 2000%." Matthew P. Branch, *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use*, 144(6) OTOLARYNGOLOGY—HEAD NECK SURGERY 950, 951 (2011), https://perma.cc/A7R7-Z6W3. That same study found that "[a]ll suppressors offered significantly greater noise reduction than ear-level protection, usually greater than 50% better," with personal protective equipment such as earmuffs

and earplugs producing an average reduction of 5-10 decibels compared to 30 decibel reduction by the four suppressors tested. *Id.* at 950.

53.    Second, suppressors are commonly used to protect the hearing of hunters and those around them. Despite the potential hearing risks, up to 95% of adult hunters report not wearing hearing protection while hunting. Deanna K. Meinke et al., *Prevention of Noise-Induced Hearing Loss from Recreational Firearms*, 38 SEMINARS IN HEARING 267, 275 (Oct. 10, 2017), https://perma.cc/2RHK-VL5J. Many sportsmen and women omit traditional ear protection because it impairs their ability to hear approaching game. Hearing protection can also hinder their ability to effectively communicate with fellow hunters and companions, causing a potential safety hazard. Suppressors make hunting safer and more effective for hunters and their companions by reducing the noise from gunshots to safer levels. The Suppressor Ban itself recognizes this fact by providing a narrow exception for the use of suppressors in certain regulated forms of hunting. N.J.S.A. § 2C:39-3(g)(5).

54.    Third, suppressors are commonly used as a public courtesy to prevent noise pollution from lawful target shooting in neighborhoods and communities. Although suppressors do not silence gunshots, they reduce the decibel level of gunshots. In fact, this was the reason suppressors were invented. Halbrook at 41. For example, Teddy Roosevelt used his suppressor to maintain good relationships with his neighbors while shooting on his property. *See* Slowik at 1.

55.    Fourth, suppressors are commonly used to make firearm training safer and to improve the accuracy of firearms. Suppressors reduce recoil, allowing for greater control of a firearm and improved accuracy. *Do Suppressors Reduce Recoil?*, SILENCER SHOP (Apr. 2, 2024), https://perma.cc/K864-N7RF. Some firearms safety instructors prefer their students to use suppressors because it prevents them from developing a flinch at the firing of a gun. Kopel, *supra*.

56.     Fifth, suppressors are commonly used to make self-defense and defense of the home safer and more effective. Suppressors also offer crucial protection for individuals engaged in self-defense because, in addition to dampening sound, suppressors reduce recoil and shot flinch, allowing greater control of a firearm and improved accuracy. *Do Suppressors Reduce Recoil?*, *supra*. In the event that an individual must use a firearm for self-defense, the individual may not have ear muffs or ear plugs at his or her disposal. Accordingly, a suppressed firearm allows the individual to exercise self-defense or defense of the home while minimizing the risk of permanent hearing loss. Further, the individual retains the ability to effectively communicate with other household members and hear outside noise or signals, which may aid in coordinating self-defense activities or contacting law enforcement. Moreover, avoiding immediate disorientation and momentary deafness is crucial to the effective use of a firearm and highly beneficial in a self-defense situation. An unsuppressed Glock 17's 162-decibel sound, *see Relative Sound Pressure Levels in Decibels (dB) of Firearms*, NAT'L GUN TRS., (July 21, 2017), https://perma.cc/T6KB-9GWU, is comparable to the 170-decibel sound produced by a "flashbang" grenade used to disable someone with light and sound. *How Do Flashbangs Work?*,  CHARLOTTE EYE EAR NOSE & THROAT ASSOCS., P.A. (Mar. 11, 2020), https://perma.cc/3EMX-JBYT**.** Noises at that volume can cause temporary deafness and disorientation to the point of loss of balance (because the fluid of the inner ear is disrupted). *Id.* A suppressed firearm permits a defending individual to avoid this harm and effectively communicate and coordinate self-defense activities while contacting the authorities.

57.     By contrast, suppressors are very rarely used for criminal purposes. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." *See* Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. CRIM. REV. 44, 51 (2007), https://perma.cc/DQ6Q-

ZW8Y. One study estimated the number of suppressor-related prosecutions—including prosecutions for the unregistered possession of a suppressor with no other crime committed—to be just 30 to 40 cases per year out of a total of 75,000 to 80,000 federal criminal prosecutions. *Id.*

58.    In 2017, acting ATF Deputy Director Ronald B. Turk confirmed that suppressors "are very rarely used in criminal shootings." Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES at 6–7 (2017), https://perma.cc/AP6R-VZFA.

59.    In an ATF White Paper, the Deputy Director explained:

In the past several years, opinions about silencers have changed across the United States. Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized. At present, 42 states generally allow silencers to be used for sporting purposes….

While DOJ [the Department of Justice] and ATF have historically not supported removal of items from the NFA, the change in public acceptance of silencers arguably indicates that the reason for their inclusion in the NFA is archaic and historical reluctance to removing them from the NFA should be reevaluated. ATF's experience with the criminal use of silencers also supports reassessing their inclusion in the NFA. On average in the past 10 years, ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions. Moreover, consistent with this low number of prosecution referrals, silencers are very rarely used in criminal shootings. Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not be viewed as a threat to public safety necessitating NFA classification, and should be considered for reclassification under the [Gun Control Act of 1968].

*Id.*

60.    And in its recent brief in *Peterson*, the United States argued that the "beneficial use" of suppressors "is *overwhelming* in relation to their criminal use." U.S. Br. at 7 (emphasis added).

61.    This makes sense, as suppressors are not of much use to criminals. After all, suppressed gunshots are by no means "silent." For example, the 127 decibels generated by a suppressed 9mm pistol are comparable to a firecracker or an ambulance siren.  Brian J. Fligor,

*Prevention of Hearing Loss from Noise Exposure* at 8, BETTER HEARING INST. (2011),
https://perma.cc/HLY7-DAWB. Accordingly, criminals who shoot suppressed weapons can still
be easily heard. Suppressors can reduce or prevent hearing damage but do not silence criminal
activity.

***

62.    The Suppressor Ban is, thus, a ban on keeping and bearing arms that are
commonly possessed and used for lawful purposes, including hearing protection, hunting, public
courtesy, firearm accuracy and training, and self-defense in the home.

63.    Defendants will not be able to show that history and tradition support an outright
ban on the possession of common suppressors by peaceable citizens. In fact, the opposite is true.
Suppressors have been lawfully used for purposes like reducing noise pollution in neighborhoods
since the early 20th century. *See* Halbrook at 45–46. Suppressors were not regulated at the federal
level until Congress enacted the NFA in 1934. Then, the Federal Government subjected them to a
tax, background check, and registration scheme. Regardless of the constitutionality of that system,
it does not support a complete ban on suppressors. Similarly, on the State level, historical practice
supports the lawful possession of suppressors. New Jersey's outright ban on peaceable citizens
possessing common suppressors is an outlier that finds no justification in history or tradition.

## II.    THE EFFECTS ON THE INDIVIDUAL PLAINTIFFS.

64.    David Padua is a peaceable, responsible, adult resident of Gloucester County, New
Jersey. Mr. Padua lives in Deptford, New Jersey.

65.    Mr. Padua spent 18 years in the United States Marine Corp until he was honorably
discharged and medically retired in 2000. He left the military as a staff sergeant, where he was a
machine gunner in an infantry unit and a machine gun instructor. At the time he left the military,
Mr. Padua was rated 10% disabled by the U.S. Department of Veterans Affairs ("VA"). By 2006,

his disability rating was increased by the VA to 60% disabled and he was rated 20% disabled due to tinnitus alone. This is the highest rating the VA will give for hearing loss. By 2018, the VA increased Mr. Padua's status again to 100% disabled due to a collection of deteriorating service-related physical injuries. In 2023, Mr. Padua was diagnosed with Meniere's Disease, which affects the inner ear and causes vertigo. The VA concluded this added condition was likely service-related.

66.    Mr. Padua is an NRA-certified instructor and teaches a variety of firearms-related classes in New Jersey. However, further deterioration of his service-related hearing injuries threatens his remaining livelihood.

67.    Mr. Padua owns a collection of firearms, has completed numerous state background checks, and holds all relevant state-required firearms permits and licenses, which remain in good standing. Mr. Padua is also an instructor for the New Jersey Permit to Carry course and qualification.

68.    The Suppressor Ban prevents Mr. Padua from owning or using suppressors in New Jersey.

69.    But for the Suppressor Ban, Mr. Padua would possess and use suppressors in New Jersey, especially given his hearing condition and desire to continue his livelihood as a firearm safety instructor.

70.    Mr. Padua would use suppressors to increase safety and effectiveness in firearm use and training and to protect against hearing damage, among other beneficial and lawful purposes.

71.    Michael Glenn is a peaceable, responsible, adult resident of Ocean County, New Jersey. Mr. Glenn lives in Forked River, New Jersey with his wife and children.

72.    Mr. Glenn joined the National Guard in 1987 where he served as a combat medic.

19

He was honorably discharged in 2012 after a deployment from 2004 to 2005. Mr. Glenn joined the Fire Department of New York ("FDNY") as a paramedic in 1995 where he served until 2020. During his tenure in the FDNY, Mr. Glenn also served on the FDNY Personal Security Detail for high-profile visitors to New York City, including presidents and vice presidents of the United States, Secretaries of State, and foreign dignitaries.

73.    Due to his long tenure in both the United States Military and the FDNY, Mr. Glenn is concerned about work-related hearing damage.

74.    Mr. Glenn has completed numerous background checks for firearms-related transactions and has all state-required firearms permits and licenses.

75.    The Suppressor Ban prevents Mr. Glenn from possessing and using suppressors in New Jersey.

76.    But for the Suppressor Ban, Mr. Glenn would possess and use suppressors in New Jersey, especially given his concerns about hearing damage.

77.    Brian Weber is a peaceable, responsible, adult resident of Hunterdon County, New Jersey. He lives in Lambertville, New Jersey with his wife and children.

78.    Mr. Weber works as a utility employee for the New Jersey American Water Company and is a Commercial Driver's License holder.

79.    Mr. Weber owns a collection of firearms and enjoys shooting for sport, hunting, and self-defense. He owns a large parcel of land where he has built a private range. While he has adequate space between his land and his neighbors, Mr. Weber is concerned that the noise from the lawful shooting activities on his property will disturb his neighbors.

80.    Mr. Weber has small children and, like many people living in more rural parts of the Garden State, is concerned about his safety both in terms of crime and dangerous wildlife,

including bears and coyotes. He is also concerned about the increased sensitivity of his children to hearing loss from exposure to the sound of a firearm should the need for self-defense arise.

81.    Mr. Weber would also like to soon begin teaching his children firearms safety but is concerned about potential hearing damage for children even with conventional hearing protection.

82.    Mr. Weber is a licensed hunter in the state of New Jersey and would like to hunt on his land and in the surrounding permissible areas and would like to be able to manage the varmint population on his property.

83.    Mr. Weber owns an integrally suppressed bolt-action rifle chambered in rimfire .22 ammunition. ATF approved his application for the suppressed rifle on June 6, 2025, and he currently keeps the suppressed rifle in a Pennsylvania trust. Mr. Weber would like to use the firearm for all of the above lawful and beneficial purposes.

84.    The suppressed rifle is held in an existing NFA Revocable Trust, domiciled in Pennsylvania, with Mr. Weber as one of three Responsible Persons. Mr. Weber has previously been approved by the federal government to possess NFA items, and the ATF again approved his possession of the suppressed bolt-action rifle after engaging in the NFA process. Mr. Weber is legally permitted to own and use it in Pennsylvania. Mr. Weber would like to bring that suppressed firearm back to his home and land in New Jersey.

85.    The Suppressor Ban prevents Mr. Weber from possessing and using suppressors in New Jersey, including the suppressed firearm he has already purchased.

86.    But for the Suppressor Ban, Mr. Weber would possess and use suppressors in New Jersey, especially given his concerns about self-defense, safe hunting, courtesy to neighbors, and protecting his children from hearing damage.

## COUNT ONE

**42 U.S.C. § 1983—Deprivation of Plaintiffs' and their Members' Rights under the Second and Fourteenth Amendments to the United States Constitution.**

87.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

88.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. CONST. amend. II.

89.     The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 750, 805–06 (2010) (Thomas, J., concurring).

90.     "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (citations omitted); s*ee also Bruen*, 597 U.S. at 28 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.").

91.     The Supreme Court has stated the test for addressing Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The Supreme Court has explained that the Second Amendment prohibits states from outrightly banning arms in common use. *See Bruen*, 597 U.S. at 70 (finding no

historical tradition  for a government "broadly prohibit[ing] the public carry of commonly used firearms for personal defense").

92.    New Jersey's Suppressor Ban bars the use of bearable arms in common use for lawful purposes that peaceable people possess by the millions. Suppressors are, therefore, neither dangerous nor unusual and cannot be banned.

93.    42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law. The Second Amendment also may be enforced against Defendants under *Ex parte Young*, 209 U.S. 123 (1908).

94.    Individual Plaintiffs are peaceable citizens of New Jersey and the United States who wish to possess suppressors banned by New Jersey.

95.    Organizational Plaintiffs sue on behalf of their members, peaceable citizens of New Jersey and the United States who wish to possess suppressors banned by New Jersey.

96.    Defendants enforce the Suppressor Ban under color of state law. *See* N.J.S.A. § 2C:39-3(c).

97.    Defendants have violated Plaintiffs' and their members' right to keep and bear arms by precluding them from being able to purchase or possess suppressors because Defendants enforce N.J.S.A. § 2C:39-3(c) and the statutes, regulations, customs, policies, and practices related thereto.

98.    Defendants' enforcement of N.J.S.A. § 2C:39-3(c) and the statutes, regulations, customs, policies, and practices related thereto, is an infringement and an impermissible burden on Plaintiffs' and their members' right to keep and bear arms pursuant to the Second and Fourteenth Amendments to the United States Constitution.

23

99.    Defendants' enforcement of N.J.S.A. § 2C:39-3(c) and the statutes, regulations, customs, policies, and practices related thereto forces Plaintiffs and their members either to comply with the unconstitutional mandate—thereby being prevented from exercising their rights under the Second and Fourteenth Amendments to the United States Constitution—or be subjected to criminal prosecution.

100.    Therefore, as a direct and proximate result of the above infringement and impermissible burden on Plaintiffs' and their members' Second and Fourteenth Amendment rights, Plaintiffs and their members have suffered—and continue to suffer—from an unlawful and irreparable deprivation of their fundamental constitutional right to keep and bear arms.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

a.    Declare that the ban on commonly possessed suppressors, N.J.S.A. § 2C:39-3(c), and all related laws, regulations, policies, and procedures, violate the right to keep and bear arms, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution, both facially and as-applied;

b.    Enjoin each Defendant, and each Defendant's respective employees, officers, agents, and representatives, and all those acting in concert or participation, from enforcing the New Jersey ban on suppressors, consisting of N.J.S.A. § 2C:39-3(c) and all statutes, regulations, customs, policies, and practices designed to enforce or implement the same;

c.    Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and,

d.      Grant any and all other and further legal and equitable relief against

Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise

deems just and proper.

Dated: July 18, 2025                    Respectfully Submitted,

                                        /s/Daniel L. Schmutter
                                        Daniel L. Schmutter
                                        HARTMAN &WINNICKI, P.C.
                                        74 Passaic Street
                                        Ridgewood, New Jersey 07450
                                        (201) 967-8040
                                        (201) 967-0590 (fax)
                                        dschmutter@hartmanwinnicki.com

                                        David H. Thompson*
                                        Peter A. Patterson*
                                        Athanasia O. Livas*
                                        COOPER & KIRK, PLLC
                                        1523 New Hampshire Ave., N.W.
                                        Washington, D.C., 20036
                                        Telephone: (202) 220-9600
                                        Facsimile: (202) 220-9601
                                        dthompson@cooperkirk.com
                                        *Pro hac vice applications forthcoming

                                        Attorneys for Plaintiffs