**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

DAVID PADUA; MICHAEL GLENN; BRIAN WEBER; ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.; SECOND AMENDMENT FOUNDATION; SAFARI CLUB INTERNATIONAL; NEW JERSEY FIREARM OWNERS SYNDICATE; AMERICAN SUPPRESSOR ASSOCIATION; and NATIONAL RIFLE ASSOCIATION OF AMERICA;

  *Plaintiffs*,

v.

MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey Police;

  *Defendants*.

No. 1:25-cv-13527-KMW-MJS

**RETURN DATE:**
**TO BE SET BY THE COURT**

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

Of Counsel and On the Brief:
 Daniel L. Schmutter
 HARTMAN & WINNICKI, P.C.
 74 Passaic Street
 Ridgewood, New Jersey 07450
 (201) 967-8040
 (201) 967-0590 (fax)
 dschmutter@hartmanwinnicki.com

On the Brief:
David H. Thompson*
Peter A. Patterson*
Athanasia O. Livas*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF THE CASE..................................................................................3

LEGAL ARGUMENT...............................................................................................9

POINT ONE...............................................................................................................9

THE STATE'S BAN ON SUPPRESSORS IMPLICATES THE SECOND AMENDMENT'S PLAIN TEXT..............................................................................9

POINT TWO.............................................................................................................18

THE STATE CANNOT MEET ITS BURDEN TO ESTABLISH A HISTORICAL TRADITION OF BANNING SUPPRESSORS ......................................................18

    A. The State's Ban on Arms in Common Use for Lawful Purposes Cannot Be Justified at Bruen's Step Two........................................................................19

    B. Alternatively, the State's Historical Analogues Fail to Justify Its Ban.........24

CONCLUSION ........................................................................................................32

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.,
    No. 24-2415, 2026 WL 2075513 (3d Cir. July 17, 2026) ......................*passim*

Caetano v. Massachusetts,
    577 U.S. 411 (2016)............................................................................ 11

District of Columbia v. Heller,
    554 U.S. 570 (2008)......................................................................1, 3, 11

Drummond v. Robinson Twp.,
    9 F.4th 217 (3d Cir. 2021) ..........................................................16, 17

Espinoza v. Mont. Dep't of Revenue,
    591 U.S. 464 (2020)...........................................................................30

Luis v. United States,
    578 U.S. 5 (2016)..............................................................................16

New York State Rifle & Pistol Association, Inc. v. Bruen,
    597 U.S. 1 (2022)...........................................1, 11, 24, 29, 30, 31

United States v. Comeaux,
    179 F.4th 297 (5th Cir. 2026) ......................................................12, 13

United States v. Cox,
    906 F.3d 1170 (10th Cir. 2018) .....................................................13

United States v. Rahimi,
    602 U.S. 680 (2024)...................................................................11, 18, 30

United States v. Saleem,
    No. 23-4693, 2024 WL 5084523 (4th Cir. Dec. 12, 2024) ...........................13

United States v. Speed,
    175 F.4th 272 (4th Cir. 2026) ......................................................13

Wolford v. Lopez,
    146 S. Ct. 2032 (2026).........................................................2, 10, 16, 17, 30

## Statutes & Constitutional Provisions

N.J. STAT. ANN.
    § 2C:39-1(g)........................................................................................4
    § 2C:39-3(c) .......................................................................................3

U.S. CONST. amend. II.....................................................................................9

## Historical Statutes

1910 La. Acts 219 ...........................................................................................27

1913 Wyo. Sess. Laws 167, Ch. 121 ..............................................................27

1915 Mont. Laws 240, Ch. 108.......................................................................27

1916 Me. Laws 248.........................................................................................27

1917 Conn. Laws 2301 Ch. 105......................................................................27

1917 Mont. Laws 494 .....................................................................................27

1919 Ohio Laws 582, Sec. 3 ...........................................................................27

1920 N.J. Laws 67...........................................................................................27

1921 Mont. Laws 527 .....................................................................................27

1921 Pa. Laws 365, No. 173 ...........................................................................27

1921 Wyo. Sess. Laws § 97, ch. 83 ................................................................27

1923 Conn. Laws 3734 Ch. 259......................................................................27

1923 Mont. Laws 210 .....................................................................................27

1923 Pa. Laws 359, 386, Act of May 24, 1923, no. 228, § 704 .............................27

1923 Utah Laws, Ch. 36 .................................................................................27

1925 Minn. Laws 489 .....................................................................................27

1925 N.C. Sess. Laws 530, Act of Mar. 7, 1925, ch. 460, § 4 ...............................27

1927 Mont. Laws 141, Ch. 152, 153 ..............................................................27

1929 Minn. Laws 168 .....................................................................................27

1929 Pa. Laws No. 519....................................................................................27

1931 Minn. Laws 538 .....................................................................................27

1931 Ore. Laws 701, Ch. 370 ..................................................................27

1931 Pa. Laws No. 147 ..........................................................................27

1933 Wyo. Session Laws 43 ...................................................................27

1935 Ala. Laws 485 ...............................................................................29

1935 La. Acts 38 ....................................................................................27

1935 Ohio Laws 311 ..............................................................................27

1935 Pa. Laws No. 118 ..........................................................................27

1937 Ill. Acts 636.................................................................................. 27

1937 Ind. Laws 97 .................................................................................27

1939 Ill. Acts 633 ..................................................................................27

Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185 ...........................27, 28

Act of May 7, 1913, no. 250, 1913 Mich. Pub. Acts 472 .......................29

Act of July 3, 1918, no. 88, § 3, 1918 La. Acts 131 ...............................27

Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359 ......................28

Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529 ...............28

Act of Mar. 29, 1927, ch. 169, 35 Del. Laws 516 ..................................27

Act of Mar. 18, 1929, ch. 84, § 14, 1929 Ariz. Sess. Laws 235.............27

**Other Authorities**

ABA Profile of the Legal Profession, AM. BAR ASS'N, https://perma.cc/KQ5L-KQU5.............................................................................................20

Matthew P. Branch, Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use, 144 OTOLARYNGOLOGY HEAD & NECK SURG. 950 (2011)..........................................................................6

Scott E. Brueck et al., Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges During Tactical Training Exercises, NAT'L INST. OCCUPATIONAL SAFETY & HEALTH (2014), https://perma.cc/JX79-KXY3....7

Larry Case, Why You Should Be Hunting With A Suppressor, AMERICAN FIELD, https://perma.cc/J3RF-XCMK....................................................21

Lila Chen & Scott E. Brueck, <u>Noise & Lead Exposures at an Outdoor Firing Range—California</u>, NAT'L INST. OCCUPATIONAL SAFETY & HEALTH (Sep. 2011), https://perma.cc/6ED7-E99T.......................................................3, 6, 7

Paul A. Clark, <u>Criminal Use of Firearm Silencers</u>, 8(2) W. CRIMINOLOGY REV. 44 (2007), https://perma.cc/75DJ-YP8K ........................................................22

<u>Current Processing Times</u>, ATF (Jul. 14, 2026), https://perma.cc/KYP3-EZTW ..19

PJ Delhomme, *What You Should Know About Hunting With Suppressors*, BOONE & CROCKETT CLUB, https://perma.cc/V37E-2ST6 .......................................21

Matthew Every, <u>How Does a Silencer Work?</u>, FIELD AND STREAM (May 11, 2023), https://perma.cc/3RFQ-6L9Q ..................................................................4

<u>Firearms Commerce in the United States: Annual Statistical Update 2021</u>, ATF (2021), https://perma.cc/9FXV-62FU .......................................................8, 9

<u>Firearms Registered in the NFRTR</u>, ATF, https://www.atf.gov/resource-center/current-processing-times................................................................8

Brian J. Fligor, <u>Prevention of Hearing Loss from Noise Exposure</u>, BETTER HEARING INST. (2011), https://perma.cc/TE5F-4PU8. ..............................5, 23

Stephen P. Halbrook, <u>Firearm Sound Moderators: Issues of Criminalization and the Second Amendment</u>, 46 CUMB. L. REV. 33 (2016) ..................................6, 23

<u>How Hearing Loss Occurs</u>, CDC, https://perma.cc/D6BC-96SA. ...........................6

<u>How to Use the Noise Reduction Rating (NRR)–Fact and Fiction</u>, 3M EDUC. (2000), https://perma.cc/WL5V-T85S.............................................................7

Glenn Kessler, <u>Are Firearms with a Silencer 'Quiet'?</u>, WASH. POST. (Mar. 20, 2017), https://perma.cc/757WYHUF. ....................................................5, 23

David Kopel, <u>The Hearing Protection Act and 'Silencers,'</u> WASH. POST. (June 19, 2017), https://perma.cc/FYQ7-D7E3. ..........................................................4

Edward Lobarinas et al., <u>Differential Effects of Suppressors on Hazardous Sound Pressure Levels Generated by AR-15 Rifles: Considerations for Recreational Shooters, Law Enforcement, and the Military</u>, 55 INT'L J. AUDIOLOGY S59, (2016).......................................................................................................8

HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER (1915), https://perma.cc/WY37-3YE2. ...............................................................4

v

Deanna K. Meinke et al., Prevention of Noise-Induced Hearing Loss from Recreational Firearms, 38 SEMINARS IN HEARING 267 (Oct. 10, 2017), https://perma.cc/2RHK-VL5J................................................................20

Noise Sources and Their Effects, PURDUE UNIV., https://perma.cc/5T4B-5JC3.......5

Wesley Nunley, The Impact of Suppressors on Shooting Performance, BLACK CREEK FIREARMS (Aug. 19, 2024), https://perma.cc/SCU6-4E4M...........8, 21

Recreational Firearm Noise Exposure, AM. SPEECH-LANGUAGE-HEARING ASS'N (2017), https://perma.cc/DYS7-8AXH.........................................................6

SilencerCo, Maxim 9 Instruction Manual, https://perma.cc/XR7C-8AX8. ............12

Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/FNR4-ZFBU. .................................................................4

Ronald Turk, White Paper: Options to Reduce or Modify Firearms Regulations, BATFE (Jan. 20, 2017), https://perma.cc/J6HR-4R3T. ............................8, 22

The American Suppressor Association (ASA), YOUTUBE (Nov. 26, 2014), http://bit.ly/3KlM4yj.............................................................................23

E. John Wipfler III, "Sound Arguments for the Purchase and Use of Firearm Suppressors" A Physician's Perspective and Recommendations, AM. COLL. EMERGENCY PHYSICIANS (July 25, 2023), https://perma.cc/8XFCK8QN. ..................................................5, 7, 8, 21

Would Suppress Silencers, NEW YORK TIMES (Feb. 3, 1916)................................29

vi

## PRELIMINARY STATEMENT

Under a straightforward application of the Supreme Court's Second Amendment jurisprudence, New Jersey's ban on the possession of firearm suppressors is unconstitutional. The key Supreme Court precedent is District of Columbia v. Heller, 554 U.S. 570 (2008), as that case, like this one, concerned a ban on a class of arms. As the Court made "more explicit" in New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 31 (2022), the Court in Heller proceeded in two steps. First, it asked whether the District of Columbia's handgun ban implicated the plain text of the Second Amendment. And as relevant here, the Court answered yes. Because the text of the Second Amendment protects "Arms" without qualification, its protection "extends, prima facie, to *all* instruments that constitute bearable arms," Heller, 554 U.S. at 582 (emphasis added), *i.e.*, "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast or strike another." Id. at 581. The Court then asked whether banning the possession of handguns was consistent with the Nation's history of firearm regulation. And the answer to that question was no. The Court concluded that "the sorts of weapons protected" by the Second Amendment are those that are "in common use," a standard the Court found "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." Id. at 627 (quotation marks omitted).

1

There was no serious question that handguns were in common use by law-abiding citizens for lawful purposes.

The principles established by Heller resolve this case. First, New Jersey's ban on suppressors implicates the Second Amendment's plain text. While a suppressor by itself is not a weapon, that is not dispositive—*no* firearm part by itself is a weapon, and if that meant firearm parts were not covered, a state could simply ban parts one by one until no useable firearms were left. The proper unit of analysis is a firearm operating with a suppressor, and it cannot be disputed that such a firearm is an arm. The answer would be the same if one focuses on the suppressor itself, because a suppressor affects how a firearm operates by reducing the noise produced by firing a shot. In short, suppressed firearms are a "form of 'Arms,'" Wolford v. Lopez, 146 S. Ct. 2032, 2043 (2026), and suppressors themselves are "instruments that facilitate armed self-defense," Bruen, 597 U.S. at 28. Therefore, however one conducts the analysis, banning suppressors implicates the Second Amendment's plain text.

Second, because suppressors are in common use, they cannot be banned. As the en banc Third Circuit recently confirmed, "*Heller* and *Bruen* teach that bans . . . on possessing . . . a class of weapons in common use for lawful purposes fail to find support in our Nation's tradition of firearm regulation." Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J., No. 24-2415, 2026 WL 2075513,

2

at \*18 (3d Cir. July 17, 2026) (en banc). Suppressors are in common use for lawful purposes. Millions of Americans own them, and they are legal to possess in 42 states. The reason for their popularity is plain: while suppressors do not silence the report of a firearm, they reduce it to a healthier level and therefore protect the hearing of firearm users and those around them when training, engaging in self-defense, or hunting. Indeed, the Federal Government itself has described suppressors as "[t]he *only* potentially effective noise control method to reduce . . . noise exposure from gunfire." Lila Chen & Scott E. Brueck, Noise & Lead Exposures at an Outdoor Firing Range—California at 5, NAT'L INST. OCCUPATIONAL SAFETY & HEALTH (Sep. 2011), https://perma.cc/6ED7-E99T (emphasis added). But "whatever the reason," the dispositive fact is suppressors are commonly used by law-abiding citizens for lawful purposes, and therefore "a complete prohibition on their use is invalid." See Heller, 554 U.S. at 629.

For these reasons, New Jersey's ban on suppressors violates the Second Amendment. Accordingly, summary judgment should be granted to Plaintiffs.

**STATEMENT OF THE CASE**

Subject to exceptions that are not relevant here, New Jersey law provides that "[a]ny person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree." N.J. STAT. ANN. § 2C:39-3(c). A "silencer" is defined as "any instrument, attachment, weapon or appliance for causing the firing of any

3

gun, revolver, pistol or other firearm to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearm." *Id*. § 2C:39-1(g). While New Jersey dubs these items "silencers," the more accurate name for them is "suppressors," because they do not actually silence the report of a firearm but simply lessen or muffle the noise to a degree.

Hiram Percy Maxim invented the first commercially successful suppressor at the dawn of the twentieth century. He dubbed his invention a "silencer" and applied for a patent in 1908. Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/FNR4-ZFBU. He invented the device to reduce sound disturbance caused by firearms. HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER 2–3 (1915), https://perma.cc/WY37-3YE2. Sporting goods magazines of the era regularly advertised the "Maxim Silencer," and its purchasers included President Theodore Roosevelt, who affixed Maxim's suppressor to his Winchester rifle. *See* David Kopel, The Hearing Protection Act and 'Silencers,' WASH. POST. (June 19, 2017), https://perma.cc/FYQ7-D7E3.

Modern suppressors, which are hollow tubes with holes at both ends and a series of interior walls called baffles, affect the operation of firearms in several ways. Matthew Every, How Does a Silencer Work?, FIELD AND STREAM (May 11, 2023), https://perma.cc/3RFQ-6L9Q. When a round is fired, the bullet travels down the barrel and out of the muzzle. It then enters the suppressor with high-pressure gas

4

following it. Id. The baffles capture the gas as the bullet passes, so the gases will dissipate more slowly. Id. This gas capture reduces both the sound of the muzzle blast from hot gases exiting the barrel and the flash of the firearm. *See* E. John Wipfler III, "Sound Arguments for the Purchase and Use of Firearm Suppressors" A Physician's Perspective and Recommendations, AM. COLL. EMERGENCY PHYSICIANS (July 25, 2023), https://perma.cc/8XFCK8QN.

Suppressors reduce the concussive force and volume of sound produced by a firearm, which helps to prevent hearing damage to those nearby when it is fired. Brian J. Fligor, Prevention of Hearing Loss from Noise Exposure, BETTER HEARING INST. (2011), https://perma.cc/TE5F-4PU8, at 8. A suppressor will reduce sound intensity by about 30 decibels. Glenn Kessler, Are Firearms with a Silencer 'Quiet'?, WASH. POST. (Mar. 20, 2017), https://perma.cc/757WYHUF. Decibels operate on a logarithmic scale, so a 10-decibel increase denotes a sound that is 10 times as intense, and a 20-decibel increase denotes a sound that is 100 times as intense. In terms of sound perception, a listener perceives a 10-decibel increase as doubling in loudness and a 20-decibel increase as quadrupling in loudness. Put simply, a listener perceives a 70-decibel sound, like a vacuum cleaner, as half as loud as an 80-decibel sound like a garbage disposal. Noise Sources and Their Effects, PURDUE UNIV., https://perma.cc/5T4B-5JC3.

5

Despite their lower volume, suppressed firearms are still quite "loud." Stephen P. Halbrook, Firearm Sound Moderators: Issues of Criminalization and the Second Amendment, 46 CUMB. L. REV. 33, 35 (2016). Suppressors do not actually silence the discharge of a firearm; they simply reduce the noise that a firearm emits. *Id.* at 36. Without the use of suppressors, almost all gunshots generate sound greater than 140 decibels. Recreational Firearm Noise Exposure, AM. SPEECH-LANGUAGE-HEARING ASS'N (2017), https://perma.cc/DYS7-8AXH. And the Center for Disease Control ("CDC") warns that even momentary exposure to sounds above that threshold risks hearing loss. How Hearing Loss Occurs, CDC, https://perma.cc/D6BC-96SA.

Accordingly, suppressors are critical components of firearm safety. They are more effective for mitigating potential hearing damage than personal protective equipment such as earplugs or earmuffs, which are susceptible to misuse. *See* Matthew P. Branch, Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use, 144 OTOLARYNGOLOGY HEAD & NECK SURG. 950, 950 (2011) ("All suppressors offered significantly greater noise reduction than ear-level protection, usually greater than 50% better. Noise reduction of all ear-level protectors is unable to reduce the impulse pressure below 140 dB for certain common firearms, an international standard for prevention of sensorineural hearing loss."). Indeed, the CDC has stated that the "only potentially effective noise control method

6

to reduce . . . noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." Chen & Brueck, supra, at 5.

This is particularly important because the effectiveness of traditional hearing protection like ear plugs or earmuffs is significantly overstated in laboratory testing. For example, the earplug manufacturer 3M recommends revision of claims about the effectiveness of hearing protection devices (like earplugs and earmuffs) by cutting their claimed reduction abilities in half. How to Use the Noise Reduction Rating (NRR)–Fact and Fiction, 3M EDUC. (2000), https://perma.cc/WL5V-T85S.

Suppressors offer other critical safety and functionality advantages for self-defense situations. An individual who stores a firearm with a suppressor attached is ensured hearing protection in the event of a late-night home invasion when there is no time to locate or equip earplugs or muffs and the need for hearing protection is at its zenith because the sound of a firearm indoors cannot disperse like it would in an outdoor setting. See Scott E. Brueck et al., Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges During Tactical Training Exercises, NAT'L INST. OCCUPATIONAL SAFETY & HEALTH, 10 (2014), https://perma.cc/JX79-KXY3 (At an indoor firing range, "instructors were exposed to more reverberant noise because the shooters were relatively close to the walls and ceiling of the nearby bullet trap."). Suppressors also aid recoil management and reduce muzzle rise, so individuals can more effectively put follow-up shots on target, especially in self-

7

defense scenarios. *See* Wipfler, supra; Wesley Nunley, The Impact of Suppressors on Shooting Performance, BLACK CREEK FIREARMS (Aug. 19, 2024), https://perma.cc/SCU6-4E4M.

As an additional benefit, unlike personal protective equipment, suppressors also protect *other people*, not just the firearm user, by reducing sound intensity at the source. See Edward Lobarinas et al., Differential Effects of Suppressors on Hazardous Sound Pressure Levels Generated by AR-15 Rifles: Considerations for Recreational Shooters, Law Enforcement, and the Military, 55 INT'L J. AUDIOLOGY S59, S63 (2016) (showing greater reduction in decibels one meter to the left of the muzzle than at the user's right or left ear). This feature is crucial in enclosed settings—such as home-defense situations—where hearing protection may be unavailable and communication is essential.

Because of all these benefits, suppressors are widely and increasingly popular across the United States. Suppressors are legal to possess in 42 states, Ronald Turk, White Paper: Options to Reduce or Modify Firearms Regulations, BATFE, 6 (Jan. 20, 2017), https://perma.cc/J6HR-4R3T ("Turk White Paper"). As of July 2026, over 6.5 million suppressors are lawfully registered with the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Firearms Registered in the NFRTR, ATF, https://www.atf.gov/resource-center/current-processing-times. That is more than double the 2.6 million registered as of 2021. Firearms Commerce in the United

States: Annual Statistical Update 2021, ATF, 16 (2021), https://perma.cc/9FXV-62FU.

Plaintiffs are individuals who desire to possess suppressors despite New Jersey's ban as well as organizations that count them as members, *see* Statement of Material Facts ¶¶ 1–10, and, for the reasons that follow, they assert that New Jersey's Suppressor Ban violates the Second Amendment right to keep and bear arms.

## LEGAL ARGUMENT

### POINT ONE

### THE STATE'S BAN ON SUPPRESSORS IMPLICATES THE SECOND AMENDMENT'S PLAIN TEXT

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

The Third Circuit, applying Supreme Court precedent, instructs that "courts must approach Second Amendment cases under a . . . two-step framework. "At the first step, we ask whether the Second Amendment's plain text covers an individual's conduct." Ass'n of N.J. Rifle & Pistol Clubs, Inc., 2026 WL 2075513, at *6 (internal quotation marks omitted). "If the answer is yes, then the Constitution presumptively protects that conduct, and the government cannot justify its regulation by simply posit[ing] that the regulation promotes an important interest." Id. (cleaned up). "Instead, at the second step the government must demonstrate that the regulation is

consistent with this Nation's historical tradition of firearm regulation. If the regulation is not consistent with that historical tradition, it cannot stand." Id. (internal quotation marks and citation omitted).

In Wolford, the Supreme Court identified three questions that courts are to ask in determining whether a challenged law applies to conduct covered by the Second Amendment's plain text. "First, does the law apply to the people—which is to say, to all members of the political community?" 146 S. Ct. at 2043 (internal quotation marks omitted). "Second, does it concern any form of Arms, *i.e.*, any weapon customarily used for offensive or defensive purposes?" Id. "Third, does the law place any restrictions on either the keeping (*i.e.,* possession) or the bearing (*i.e.*, carrying) of arms?" Id. (cleaned up). The answer to those questions demonstrates that the Constitution's plain text is implicated by New Jersey's suppressor ban.

*First*, the individual plaintiffs and the members of the organizational plaintiffs "are among 'the people' protected by the Second Amendment." Wolford, 146 S. Ct. at 2047. They are peaceable individuals who seek to keep and bear suppressed firearms for various safety-enhancing uses. Id.; see Decls. of Padua, Weber, Glenn.

*Second*, "the plain text of the Second Amendment protects what [plaintiffs] want to do," which is keep and bear suppressed firearms. Wolford, 146 S. Ct. at 2047 (internal quotation marks omitted). The en banc Third Circuit recently emphasized that the Supreme Court "defines 'Arms' *broadly*," and that the right "covers modern

10

instruments that facilitate armed self-defense." Ass'n of New Jersey Rifle & Pistol Clubs, Inc., 2026 WL 2075513, at *15 (emphasis added).

Indeed, the Supreme Court has interpreted the Second Amendment's plain text broadly to cover all "arms-bearing conduct." United States v. Rahimi, 602 U.S. 680, 691 (2024). The original meaning of the term "arms" in the Second Amendment "is no different from the meaning today": "[w]eapons of offence, or armour of defence." Heller, 554 U.S. at 581 (quoting 1 Samuel Johnson, Dictionary of the English Language 106 (4th ed. 1773) (reprinted 1978)). As a matter of plain text, then, arms include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." Id. (quoting 1 Timothy Cunningham, A New and Complete Law Dictionary (1771)). This "historically fixed meaning applies to new circumstances." Bruen, 597 U.S. at 28. It is not limited "only [to] those arms in existence in the 18th century." Id. (quoting Heller, 554 U.S. at 582). This "general definition" therefore "covers modern instruments that facilitate armed self-defense," id., regardless of whether they are "thoroughly modern invention[s]," Caetano v. Massachusetts, 577 U.S. 411, 412 (2016) (citation omitted).

Here, the relevant conduct for purposes of the Second Amendment analysis is the possession of a firearm equipped with a suppressor—that is, a suppressed firearm. A suppressor has no purpose other than for use as part of a firearm, so it

11

cannot be divorced from the firearm to which it is affixed for purposes of considering the constitutionality of a suppressor ban.

A suppressor is a component part of a safe and effective firearm—sometimes an *integral* component that is not detachable from the rest of the firearm.[1] The plain text of the Second Amendment covers the possession of a suppressed firearm because a suppressed firearm is an "arm": it is "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." Heller, 554 U.S. at 581 (citation omitted). A suppressed firearm fits well within this broad definition. "Even the narrowest Founding-era definition of Arms addressed by the *Heller* Court stated that all firearms constituted arms." Ass'n of New Jersey Rifle & Pistol Clubs, Inc., 2026 WL 2075513, at *15 (internal quotation marks omitted).

For these and other reasons, the Fifth Circuit Court of Appeals recently held that suppressors are Arms under the Supreme Court's definition and thus subject to the Second Amendment's protection. The Court concluded that suppressors are Arms because they "lead to reduced loudness (and reduced risk of hearing loss), lower recoil from the firearm, elimination of muzzle blast, increased accuracy, and faster follow-up shots." United States v. Comeaux, 179 F.4th 297, 301 (5th Cir.

---

[1] For example, the SilencerCo Maxim 9 has a permanently affixed suppressor built into it. The Maxim 9 is an "arm." *See* SilencerCo, Maxim 9 Instruction Manual, https://perma.cc/XR7C-8AX8.

2026) (internal quotation marks omitted). "Those are all critical functions that make firearms both safer and more effective for their core lawful purpose of self-defense." Id. In sum, "[b]ecause silencers are used in self-defense 'to cast at or strike another,' they are Second Amendment 'Arms.'" Id. (quoting Heller, 554 U.S. at 581). The Court rejected arguments by the government that "silencers are not 'Arms' because, though useful, silencers are not necessary to the functioning of a gun and are not traditionally tied to militia service." Id. at 302. As the Court explained, "claimants need not prove either of those factors to succeed." Id.

Out-of-circuit decisions to the contrary fail to persuade. The Tenth Circuit, in a sparsely reasoned decision that predates Bruen, concluded, without further explanation, that a "silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." United States v. Cox, 906 F.3d 1170, 1186 (10th Cir. 2018). Similarly, the Fourth Circuit stated in an unpublished opinion that a suppressor is a mere "firearm accessory" that "fails to serve a core purpose in the arm's function." United States v. Saleem, No. 23-4693, 2024 WL 5084523, at *2 (4th Cir. Dec. 12, 2024). And in its more recent published opinion on the topic, the Fourth Circuit acknowledged this earlier unpublished decision yet declined to adopt its holding. The Court concluded: "we need not decide whether silencers are arms protected under the text of the Second Amendment." United States v. Speed, 175 F.4th 272, 285 (4th Cir. 2026); see also id. (citing Saleem).

13

In any case, the view that suppressors are not Arms because they are "accessories" is foreclosed by the Third Circuit's (recently reaffirmed) reasoning "that magazines are 'arms' within the meaning of the Second Amendment." Ass'n of New Jersey Rifle & Pistol Clubs, 2026 WL 2075513, at *21 (quoting Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey, 910 F.3d 106, 116 (3d Cir. 2018), abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022)).

The en banc Third Circuit explicitly considered—and rejected—the argument that a component part of a firearm that may be described as an "accessory" or "accoutrement[]" is not protected by the Second Amendment. The Court acknowledged that New Jersey argued "that a large-capacity magazine [("LCM")] is an ammunition container that is harmless when it is not attached to a gun. Accordingly, the State reasons that LCMs do not fit into *Heller*'s Founding-era definitions of Arms." Ass'n of New Jersey Rifle & Pistol Clubs, Inc., 2026 WL 2075513, at *22. The State further argued that "LCMs do not fall into that protected subcategory because no firearm *requires* a magazine with a capacity of more than ten rounds to function." Id. (emphasis added). "The State urge[d the Third Circuit] to adopt the Ninth Circuit's view that LCMs are not arms but accessories of weaponry, referred to as "accoutrements" in the Founding era." Id. But the Third Circuit declined.

14

Considering these arguments, the en banc Third Circuit found "a few problems with this reasoning." Id. at *23. "First, this reliance on Founding-era definitions of Arms is at odds with the Supreme Court's instruction in *Bruen*. There, the Court explained that . . . th[e] general definition covers modern instruments that *facilitate armed self-defense.*" Id. (internal quotation marks omitted, emphasis original). And, the Court explained, "even where a particular arm does not require the use of a magazine, a magazine unquestionably facilitates the arm user's ability 'to cast at or strike another.'" Id. (quoting Heller, 554 U.S. at 581). "Accordingly, magazines are arms." Id. The same is true of suppressors.

Critically, the en banc Third Circuit was "unpersuaded by the State's argument that LCMs are not Arms covered by the Second Amendment because they are not *necessary* to operate a firearm." Id. at *23 (emphasis added). Simply put: "the text of the Second Amendment does not limit 'Arms' to the minimum equipment necessary to operate a weapon." Id.

Further, the thinly reasoned out-of-Circuit precedents cannot be squared with the Supreme Court's focus on arms-bearing *conduct*. The plain text of the Second Amendment is implicated by the banning of suppressed firearms because regulation of suppressors cannot be viewed in isolation—it is a regulation of suppressed firearms, which indisputably are arms. After all, regulation of a component part or a mere "accessory" of a firearm is not only a regulation of that part in the abstract or

15

in a vacuum. It is a regulation of the keeping and bearing of the firearms that function *with* the component part. If suppressors were simply metal tubes not capable of functioning with bearable firearms, it would make no sense for New Jersey to ban and criminalize them. This Court should not be persuaded to make the same error.

Alternatively, even if suppressors or suppressed firearms are not themselves arms, the Second Amendment covers suppressors because they are designed to facilitate the use or affect the functionality of an arm. As explained above, the keeping and bearing of suppressed firearms is plainly covered by the Second Amendment. Even analyzing suppressors in isolation, they still implicate the Second Amendment. After all, the Supreme Court recently explained that the Second Amendment applies whenever "the law place[s] *any restrictions* on either the 'keep[ing]' (*i.e.,* possession) or the 'bear[ing]' (*i.e.*, carrying) of arms." Wolford, 146 S. Ct. at 2043 (emphasis added).

All constitutional rights "implicitly protect those closely related acts necessary to their exercise." Luis v. United States, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). This is no different for the Second Amendment. The Third Circuit, even before Bruen, recognized that the Second Amendment right "implies a corresponding right to acquire and maintain proficiency" with common weapons. Drummond v. Robinson Twp., 9 F.4th 217, 227 (3d Cir. 2021). "A right

16

to bear those weapons, after all," the Court reasoned, "wouldn't mean much without the training and practice that make [them] effective." Id.

Suppressors likewise facilitate the safe and effective exercise of the Second Amendment right. Just as a firing range provides a place in which the discharge of a firearm is carefully controlled, preventing damage to property or injury to the user or bystanders, a suppressor reduces the sound produced by firing a firearm to a much safer level, permitting the right to be exercised with a reduced risk to one's hearing (and the hearing of others around). In fact, suppressors are key to making firing ranges themselves functional, since those are locations where the sounds of gunfire are concentrated. The noise suppression enabled by suppressors is crucial to realizing the benefits of the training and practice that the Third Circuit has already held is protected by the Second Amendment.

*Finally*, the third question under the plain-text inquiry is: "does the law place any restrictions on either the keeping (*i.e.,* possession) or the bearing (*i.e.*, carrying) of arms?" Wolford, 146 S. Ct. at 2044 (cleaned up). Here, the answer is plainly yes, since Defendants enforce a full criminal ban on the possession and use of suppressors. The ban targets both the keeping and bearing of suppressors and suppressed firearms. Further, the clear answer on question three that banning suppressors plainly restricts the keeping and bearing of arms shows that suppressors must be protected arms.

17

Because New Jersey's ban affects "arms-bearing conduct," <u>Rahimi</u>, 602 U.S. at 691, the plain text of the Second Amendment applies and the State must justify its regulation.

**POINT TWO**

**THE STATE CANNOT MEET ITS BURDEN TO ESTABLISH A HISTORICAL TRADITION OF BANNING SUPPRESSORS**

Because the State's ban on the possession of suppressed firearms implicates the Second Amendment, the law is presumptively unconstitutional. The State therefore bears the burden of justifying its law by proving that it is consistent with our Nation's historical tradition of firearm regulation.

The Third Circuit has explained that "[t]he government may carry its burden at *Bruen*'s second step by demonstrating that relevantly similar modern and historical regulations impose a comparable burden on the right of armed self-defense and that the burden imposed is comparably justified." <u>Ass'n of New Jersey Rifle & Pistol Clubs, Inc.</u>, 2026 WL 2075513, at *6 (cleaned up). "In comparing modern and historical regulations," the Court explained, "we consider at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." <u>Id.</u> (internal quotation marks omitted). Under both metrics, New Jersey cannot justify an across-the-board ban on possession of arms in common use for all lawful purposes.

18

**A. The State's Ban on Arms in Common Use for Lawful Purposes Cannot Be Justified at <u>Bruen's</u> Step Two.**

The State has not—and cannot—meet its historical burden as a matter of law because the State seeks to defend an outright ban on an arm in common use, which the Supreme Court and Third Circuit have *already* determined finds no basis in our Nation's history and tradition. "Together, *Heller* and *Bruen* teach that bans or broad prohibitions on possessing or carrying of a class of weapons in common use for lawful purposes fail to find support in our Nation's tradition of firearm regulation. That is so even when the regulations are passed with the intention of reducing gun violence." <u>Id</u>. at *18. In <u>New Jersey Rifle and Pistol Clubs</u>, the en banc Third Circuit found that this "principle resolves [the] inquiry." <u>Id</u>. The same is true here. "That is because the Supreme Court has already evaluated the historical analysis for the kind of regulation before us today: a prohibition of an entire class of arms that is overwhelmingly chosen by American society for [a] lawful purpose." <u>Id</u>. (internal quotation marks omitted). Simply put: "There is no historical support for such a measure." <u>Id</u>. As explained below, because suppressors are in common use for lawful purposes, the State cannot escape the Third Circuit's precedent.

First, suppressed firearms are in common use. Suppressors are legal to possess in 42 states, Turk White Paper at 6, and there are over 6.5 million suppressors registered with the ATF, *see* <u>Current Processing Times</u>, ATF (July 14, 2026), https://perma.cc/KYP3-EZTW. By way of comparison, there are four times as many

19

suppressors as there are attorneys in the United States. See ABA Profile of the Legal Profession, AM. BAR ASS'N, https://perma.cc/KQ5L-KQU5 (showing 1.37 million registered lawyers in 2025).

Second, suppressors are overwhelmingly used for lawful reasons. Suppressors assist law-abiding citizens, including both the bearer of a firearm and innocent bystanders, in ensuring their safety and the prevention of permanent injury. The publicly available evidence is indisputable: suppressors are used by law-abiding citizens to reduce or prevent hearing damage and aid in training, hunting, and self-defense, and they are very rarely used for criminal purposes.

As detailed above, suppressors have been described by leading authorities as the only truly effective method of hearing protection during firearm use. See supra, Statement of the Case. And suppressed firearms are especially useful in training, hunting, and self-defense. In each of these situations, it is important for the bearer of the firearm to be able to hear commands of others (and, in the case of hunters, approaching game), as well as protect bystanders from hearing damage or disorientation.

As for hunting, despite the hearing risks, up to 95% of adult hunters report not wearing hearing protection while hunting. Deanna K. Meinke et al., Prevention of Noise-Induced Hearing Loss from Recreational Firearms, 38 SEMINARS IN HEARING 267, 275 (Oct. 10, 2017), https://perma.cc/2RHK-VL5J. This is not surprising

20

despite the long-term risks, as hunters must maintain situational awareness to hear the quiet rustling sounds of game. Larry Case, <u>Why You Should Be Hunting With A Suppressor</u>, AMERICAN FIELD, https://perma.cc/J3RF-XCMK. Suppressors also protect the sensitive hearing of hunting dogs and those who happen to live near hunting grounds. PJ Delhomme, <u>What You Should Know About Hunting With Suppressors</u>, BOONE & CROCKETT CLUB, https://perma.cc/V37E-2ST6.

When it comes to self-defense, as the State's expert admitted, "in my opinion, nobody's going to do [ear protection] in a home defense situation." James Yurgealitis Dep. Tr. at 16:2–17:15 (July 16, 2026) ("Yurgealitis Dep."), attached to Declaration of Counsel as Exhibit 1. This makes sense, since traditional hearing protection takes precious time to set up. "To roll two foam earplugs, put them in your ears, and put your ear muffs over the top of those . . . [takes] one to two minutes." <u>Id</u>. at 17:20–18:1. But time is of the essence in a self-defense scenario. "[T]he sooner you can respond to it, the better." <u>Id</u>. at 17:20–18:1. <u>Id</u>. at 16:6–17.

Besides saving time in critical scenarios, suppressors also have other additional safety-enhancing benefits. By reducing not only sound but also muzzle blast and flash from the shot of a firearm, suppressors aid in self-defense by preventing momentary deafness and disorientation. <u>See</u> Wipfler, <u>supra</u>; Nunley, <u>supra</u>. Because of these benefits, they are chosen for lawful use by millions of Americans.

21

Meanwhile, suppressors are rarely used in crime. Defendants' own expert stated: "my opinion is that suppressors are not often used by criminals to commit firearms-related crimes." Yurgealitis Dep. at 51:1–3. And his opinion is backed up by the facts. As a former ATF Deputy Director explained, suppressors are rarely used in criminal activity. *See* Turk White Paper, at 6–7. See also Paul A. Clark, Criminal Use of Firearm Silencers, 8(2) W. CRIMINOLOGY REV. 44 (2007), https://perma.cc/75DJ-YP8K. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." *Id.* at 51. One study estimated the number of suppressor-related prosecutions to be just 30 to 40 cases per year out of a total of 75,000 to 80,000 federal criminal prosecutions. Id.

For all of these reasons, the Federal Government has now acknowledged that suppressors' "beneficial use is overwhelming in relation to their criminal use." Gov'ts Suppl. Resp. to Def's. Pet. for Rehearing En Banc at 7, United States v. Peterson, No. 24-30043 (5th Cir. May 29, 2025), Dkt. No. 135. Indeed, the Federal Government has now sued the District of Columbia on Second Amendment grounds, challenging the District's suppressor ban, which is in all relevant respects identical to the State's ban here, as unconstitutional. First Am. Compl., United States v. Dist. of Columbia, No. 1-25-cv-004458-APM, Doc. 28 (D.D.C. May 14, 2026), ¶ 4 ("[S]uppressors are also in common use by law-abiding Americans and categorically banning them violates the Second Amendment.").

22

These statistics are not surprising based on how suppressors function. Since suppressors do not actually "silence" a firearm, they do not allow wrongdoers to hide the sound of a gunshot. "[D]espite movie fantasies[,] a noise suppressor reduces decibels, but does not actually 'silence' the discharge of a firearm." Halbrook, supra, at 36. Instead, they "decreas[e] the overall sound signature." The American Suppressor Association (ASA), YOUTUBE (Nov. 26, 2014), at 0:39–0:49, http://bit.ly/3KlM4yj (demonstrating the use of suppressors and their decibel level reduction). Suppressed firearms are, in fact, still quite "loud." Halbrook, supra, at 35; see also Kessler, supra. For example, the 127 decibels generated by a suppressed 9mm pistol are comparable to a firecracker or an ambulance siren. Fligor, supra, at 8.

The State has thus enacted "a prohibition of an entire class of arms that is overwhelmingly chosen by American society for a lawful purpose." Ass'n of New Jersey Rifle & Pistol Clubs, Inc., 2026 WL 2075513, at *18 (quoting Heller, 554 U.S. at 628). Under Third Circuit and Supreme Court precedent, that is the beginning and end of the historical inquiry. The Supreme Court has already done the historical work, and the State cannot justify its ban under the Nation's history and tradition of firearm regulation. Id.

23

**B. Alternatively, the State's Historical Analogues Fail to Justify Its Ban.**

Because suppressors are in common use for lawful purposes, that is the end of the matter. But for the sake of argument, the State cannot prove any historical tradition that would support its blanket ban on suppressors.

The State bears the burden of identifying a "well-established and representative historical analogue." Bruen, 597 U.S. at 30 (emphasis omitted). To determine whether the modern regulation and the historical analogue are "relevantly similar," the Court looks to the "how and why" of the two regulations. Id. at 29. Here, the State's historical analogues fail on both counts. None of the State's cited laws regulate peaceable possession like the State's criminal ban on the possession of suppressors, and none concern analogous arms.

When presented with allegedly analogous laws, "courts evaluating historical analogues should consider three factors." New Jersey Rifle & Pistol Clubs, 2026 WL 2075513, at *8. These include: "(1) the number of jurisdictions in which the historical restrictions were adopted, (2) the extent to which the historical restrictions were well-accepted, whether expressly or tacitly, and (3) whether the historical restrictions are relevantly similar to the modern challenged law." Id. "To be relevantly similar, the how and why of the historical analogue and modern regulation must be close enough to enable a court to say: Because this historical law was understood to be compatible with the right codified by the Second Amendment, we

24

can infer that the restriction imposed by the modern law is likewise consistent with that right." Id.

At the outset, historical analogues from the wrong time period—that is, any period other than the Founding era—carry little to no weight. The Third Circuit has "concluded that we must look to Founding-era laws for analogies to modern-day regulations" at Bruen's second step. Id. This binding precedent applies equally to the analysis of protected arms that did not exist at the Founding. The State must still muster other "historical examples" from the relevant time period to justify its modern regulation. Id. And the Court must "guard against giving postenactment history more weight than it can rightly bear." Id. (internal quotation marks omitted).

For this reason alone, many of the State's historical references are inapplicable. See, e.g., Report and Decl. of Robert Spitzer at ¶ 17, attached to Declaration of Counsel as Exhibit 2 ("Spitzer Report") (citing a 1909 New York Times article); id. at ¶ 18 ("The first state laws outlawing silencers' sale . . . all enacted restrictions in 1909."); id. at ¶ 22 (citing 1922 article); id. at ¶ 23 (referencing laws from 1909 to 1937); id. at ¶ 25 (citing 1915 articles); id. at ¶ 26 (citing events from 1917 through 1926); id. at ¶ 27 (describing events from 1911 to 1912); id. at ¶¶ 28–38 (similarly focusing only on the early 20th century).

Even putting the dispositive timing issue aside, the State's historical analogues do not provide sufficient support for an outright suppressor ban.

25

The State's expert witness argues that "[f]rom 1909 to 1937, at least 29 states (plus the District of Columbia) enacted at least 65 silencer restrictions laws, with some of them specifically barring their use in hunting." Spitzer Report at ¶ 23. And "[b]etween 1909 and 1919, a total of at least 16 states enacted anti-silencer laws; 15 states did so between 1920 and 1929; and 16 states did so between 1930 and 1937 (note that some states enacted anti-silencer laws in multiple decades)."[2] Id.

This characterization does not accurately reflect these historical restrictions. Most of these laws focused on only one, discrete use of suppressors: certain types of hunting. They did not ban possession of suppressors for virtually every use (like New Jersey's current law). To summarize, the State's expert cites 66 historical laws for the claim that 29 States regulated suppressors. But 46 of those statutes were narrow, circumscribed regulations as to the permissible uses or registration of suppressors. Only 20 (less than one-third) can be characterized as a virtual ban on suppressors. And only 17 of the claimed 29 States—still a wide minority—can be characterized as ever having had a ban on suppressors based on the State's expert's data.

---

[2] One of Spitzer's citations for a claimed historical state suppressor law is 1914 W. Va. Acts 2791. See Spitzer Report at 13 n. 25. This citation does not appear to exist. Plaintiffs' counsel have found no record of any 1914 session of the legislature in West Virginia.

Most of the State's historical examples only regulated suppressors as to certain kinds of hunting. See, e.g., Act of Mar. 29, 1927, ch. 169, 35 Del. Laws 516 (1927) (restricting suppressor use in hunting); Act of July 3, 1918, no. 88, § 3, 1918 La. Acts 131, 132 (same); § 97, ch. 83, 1921 Wyo. Sess. Laws 112–13 (same); Act of Mar. 18, 1929, ch. 84, § 14, 1929 Ariz. Sess. Laws 235, 246–47 (same); 1917 Conn. Laws 2301 Ch. 105 (same); 1923 Conn. Laws 3734 Ch. 259 (same); 1937 Ill. Acts 636 (same); 1939 Ill. Acts 633 (same); 1937 Ind. Laws 97 (same); 1910 La. Acts 219 (same); 1935 La. Acts 38; 1916 Me. Laws 248; 1925 Minn. Laws 489 (same); 1929 Minn. Laws 168 (same); 1931 Minn. Laws 538 (same); 1915 Mont. Laws 240, Ch. 108 (same); 1917 Mont. Laws 494 (same); 1921 Mont. Laws 527 (same); 1923 Mont. Laws 210 (same); 1927 Mont. Laws 141, Ch. 152, 153 (same); Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185 (same); 1920 N.J. Laws 67 (same); 1925 N.C. Sess. Laws 530, Act of Mar. 7, 1925, ch. 460, § 4 (same); 1919 Ohio Laws 582, Sec. 3 (same); 1935 Ohio Laws 311 (same); 1931 Ore. Laws 701, Ch. 370 (same); 1921 Pa. Laws 365, No. 173 (same); 1923 Pa. Laws 359, 386, Act of May 24, 1923, no. 228, § 704 (same); 1929 Pa. Laws No. 519 (same); 1931 Pa. Laws No. 147 (same); 1935 Pa. Laws No. 118 (same); 1923 Utah Laws, Ch. 36 (same); 1913 Wyo. Sess. Laws 167, Ch. 121 (same); 1933 Wyo. Session Laws 43 (same).

In fact, even New Jersey limited its regulation to certain forms of hunting. *See* Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185 ("It shall be unlawful to use any

27

silencer, when hunting for game or fowl"). Similarly, North Carolina prohibited the use of suppressors only "to trap for bear or to run or hunt deer with dogs or . . . while hunting." Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529, 530. Pennsylvania made it illegal to use suppressors to "hunt for, or catch or take or kill or wound, or attempt to catch or take or kill or wound, game of any kind, excepting raccoons." Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359, 386.

Given that one of the few states that regulated suppressors included a carveout to hunt *raccoons*, see id., it begs credulity to argue that these narrow regulations had the same "why" and "how" as New Jersey's outright criminal ban on all peaceable possession.

Indeed, the en banc Third Circuit recently recognized that the Supreme Court explicitly *rejected* reliance on similar hunting laws for broader bans on the Second Amendment right. In Wolford, the Supreme Court "rejected the state's historical analogues, which were primarily laws prohibiting unauthorized hunting of game on someone else's property." Ass'n of New Jersey Rifle & Pistol Clubs, Inc. 2026 WL 2075513, at *8. The Court, considering the constitutionality of a broader ban on carrying a firearm on privately owned but publicly accessible property, found that "[t]hose historical laws were not relevantly similar in *why* they were enacted." *Id.* (emphasis original). "Targeted at unauthorized hunting, those laws aimed to prevent theft of game and the firing of guns that could inflict injury or disturb others on

28

private property. . . . [while] Hawaii's modern law does not address any of those unwanted effects." Id.

The same is true here. The "why" behind most of the cited state restrictions was altogether different than the State's ban on peaceable possession. Many States were concerned with fairness in hunting. As one contemporaneous article explained, "the use of the silencers in the shooting of game is forbidden in some of the States, as in New Jersey and Vermont, because it is believed that it gives too great an advantage to poachers and to those who are shooting out of season." Would Suppress Silencers, NEW YORK TIMES (Feb. 3, 1916).

Other of the State's historical examples are inapposite for other reasons. For example, Alabama's statute focused purely on merchant recordkeeping. See 1935 Ala. Laws 485 ("All persons dealing in Pistols, revolvers and maxim silencers, shall be required to keep a permanent record of the sales of every pistol, revolver or maxim silencer"). And Michigan required registration but did not ban or otherwise limit peaceable possession. See Act of May 7, 1913, no. 250, 1913 Mich. Pub. Acts 472.

The remaining historical regulations from a minority of States are insufficient to justify the State's ban. First, these regulations are all from the 20th century, so they tell us nothing about the original meaning of the Second Amendment, which is the relevant inquiry under binding precedent. See Bruen, 597 U.S. at 66 n.28

29

(declining to consider 20th century evidence); <u>Rahimi</u>, 602 U.S. at 692 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding."); <u>Espinoza v. Mont. Dep't of Revenue,</u> 591 U.S. 464, 482 (2020) (holding that laws from "more than 30 States" from the second half of the 19th century are insufficient to "establish an early American tradition").

Second, this minority of suppressor regulations cannot be said to shed light on "the *general* understanding of that codified right at the relevant point in time." <u>Wolford</u>, 146 S. Ct. at 2050. The Supreme Court has made clear that "[a]n outlier legal rule adopted in a few locales is not enough." <u>Id</u>.

Finally, even if these sources were sufficient to show that suppressors were considered dangerous and unusual weapons 100 years ago (and they are not), they certainly cannot establish that suppressors are dangerous and unusual *today*, and that is the relevant question. Indeed, the Supreme Court has made clear that an arm that at one time is considered dangerous and unusual can at a later time be in common use. Again, if a firearm is in common use, it may not be banned consistent with the historical tradition of permitting the keeping and bearing of firearms in common use. "Thus, even if" early 20th Century laws regulated the possession and use of suppressors "because they were considered 'dangerous and unusual weapons' " at

30

that time, "they provide no justification for laws restricting the" possession of suppressors because suppressors are "in common use today." Bruen, 597 U.S. at 47.

The weakness of the State's position is evident in attempts by the State's expert to analogize suppressors to dangerous and unusual historical weapons like trap guns, bowie knives, and long-bladed knives. But that analogy fails. The en banc Third Circuit already rejected the State's appeal to these laws to justify a ban on arms in common use. The Third Circuit noted that, "New Jersey also offers up Antebellum and Reconstruction-era regulations of Bowie knives, slungshots and clubs, pistols, and revolvers as potential analogues." Ass'n of New Jersey Rifle & Pistol Clubs, Inc., 2026 WL 2075513, at *19. But it recognized that "those regulations are insufficiently analogous for two reasons: They are too late in time, and none enacted an outright ban on a class of weapons in common use for lawful purposes." Id.

As explained above, by contrast to the examples of historically regulated firearms and their uses, suppressors are very rarely used for criminal or harmful purposes. Indeed, even the State's own expert admitted as much. See Yurgealitis Dep. at 50:16–51:3 ("[M]y opinion is that suppressors are not often used by criminals to commit firearms-related crimes."). Therefore, the State's analogy to weapons that are routinely used by criminals is inapposite.

31

In sum, New Jersey may not criminally ban the peaceable possession of suppressors consistent with the Second Amendment. Binding precedent establishes that a State may not ban an arm in common use consistent with the Second Amendment. And the State's historical analogues, which are either facially distinguishable or from an irrelevant time period to discerning Founding-era constitutional meaning, do nothing to change that conclusion.

## CONCLUSION

For the foregoing reasons, summary judgment in Plaintiffs' favor should be granted.

Respectfully Submitted,

David H. Thompson*
Peter A. Patterson*
Athanasia O. Livas*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
*Admitted Pro Hac Vice

s/Daniel L. Schmutter
Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com

*Attorneys for Plaintiffs*

32

## CERTIFICATE OF SERVICE

I certify that on August 7, 2026, this motion was electronically filed with the Clerk of Court in the United States District Court for the District of New Jersey through the Court's CM/ECF system, which filing effected service upon counsel of record through the CM/ECF system.

/s/ Daniel L. Schmutter
Daniel L. Schmutter
*Attorney for Plaintiffs*

33